# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

TERRY LEQUAN DIXON,

      Petitioner,

v.                                                    Case No. 3:22-cv-91-TJC-SJH

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

# **ORDER**

## I.    **Status**

Petitioner Terry Lequan Dixon, an inmate of the Florida penal system, initiated this action by filing a pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. See Doc. 1. With help from retained counsel, Petitioner is proceeding on an Amended Petition. See Doc. 5. He challenges a state court (Duval County, Florida) judgment of conviction for accessory after the fact. He is serving a fifteen-year term of incarceration. Respondents filed a Response. See Doc. 9 (Resp.).[1]And Petitioner, with help from counsel, filed a

---

[1] Attached to the Response are various exhibits (Docs. 9-1 to 9-25). The Court refers to the exhibits as "Resp. Ex."

Reply. See Doc. 10. This case is ripe for review.[2]

## II.   <u>Governing Legal Principles</u>

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See <u>Harrington v. Richter</u>,

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

3

disagree on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> [at 102] (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. <u>See, e.g.</u>, <u>Mitchell v. Esparza</u>, 540 U.S. 12, 18 (2003); <u>Lockyer</u>, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

<u>Bishop v. Warden, GDCP</u>, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. <u>See</u> 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate

review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope</u>

<u>v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> "'opportunity to pass upon and correct' alleged
> violations of its prisoners' federal rights.'" <u>Duncan v.</u>
> <u>Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d
> 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404
> U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To
> provide the State with the necessary "opportunity," the
> prisoner must "fairly present" his claim in each
> appropriate state court (including a state supreme
> court with powers of discretionary review), thereby
> alerting that court to the federal nature of the claim.
> <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan</u>
> <u>v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies

results in a procedural default which raises a potential bar to federal habeas

review. The United States Supreme Court has explained the doctrine of

procedural default as follows:

> Federal habeas courts reviewing the constitutionality
> of a state prisoner's conviction and sentence are guided
> by rules designed to ensure that state-court judgments
> are accorded the finality and respect necessary to
> preserve the integrity of legal proceedings within our
> system of federalism. These rules include the doctrine

> of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[3] <u>supra</u>, at 747–748, 111 S. Ct. 2546; <u>Sykes</u>,[4] <u>supra</u>, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from

---

[3] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[4] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

> raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of

---

[5] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th

Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105. As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see also Evans v. Sec'y, Dep't</u>

<u>of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.  **Factual and Procedural History**

The following summary is taken from Petitioner's initial brief filed on direct appeal:

> By Second Amended Information filed May 12, 2014, the State of Florida charged Mr. Dixon with being an Accessory after the Fact. The State specifically alleged Mr. Dixon "did maintain, assist or give aid to William Davis by providing the vehicle used during the commission of the crime, knowing that William Davis had committed . . . Armed Robbery, with the intent that William Davis shall avoid or escape detection, arrest, trial or punishment." Both Davis and Mr. Dixon asserted their constitutional right to trial by jury.
>
> Prior to trial the State filed a motion for joinder pursuant to rule 3.150(b), Florida Rules of Criminal Procedure to try Davis and Mr. Dixon together. The State alleged the cases were related in that they were triable in the same court and were based on the same acts or transactions and were part of a common scheme or plan. Mr. Dixon objected to the motion for joinder arguing:
>
>> Your Honor, I would object to the motion for joinder. . . . Just, specifically, for my client's case, the codefendant, there was the victim's property was found on the codefendant. There was no property found on my client. As well as the identity --- there was an identification, show-up identification with the codefendant, and there is not a 100 percent identification of my client. Because of those issues, I think

10

those are separate, appropriate for separate cases.

However, when the trial court asked "[i]s there any legal reason why they couldn't be joined?" the defense replied "[n]o, Your Honor, I guess, the difference in the evidence." The trial court granted the motion for joinder. There was not a subsequent defense request to sever the trials.

At trial, the State called Samantha Jenerette, a named victim of Davis' armed robbery charge. On April 22, 2013, she and her friend's nine year-old son, T.G., went to Wal-Mart. While there, she met a man, asked him for help with finding light bulbs, and where she could obtain marijuana. Ms. Jenerette exchanged phone numbers with the man so she could later meet up with him and purchase the marijuana. Sometime after 10:00 P.M. she left Wal-Mart, called the man, and the two agreed to meet at a near-by Captain D's.

Ms. Jenerette ultimately drove across the street to an apartment complex and called the man to let him know her whereabouts. The man told her to come around to the side of the apartment complex and she complied. There, she parked next to a red car, where she observed a man in a white shirt with a low hair cut in the front seat and another individual standing behind the vehicle. She got out of her vehicle, was hit from behind, and fell to the ground. When on the ground someone pointed a gun at her.

The man wearing the white shirt exited the red car, went through her pockets, and took her car key, cell phone, and food stamp card bearing her name. He then entered her car, asking T.G. for money. T.G. provided the man with money, the man told her to remain on the ground until they left, and two or three people got in the red car and sped off. She and T.G. then ran back to the Wal-Mart, flagged someone down, and used his phone to call 9-1-1. Ms. Jenerette informed the

9-1-1 operator she was robbed and that the three black males fled in a red Corolla.

Ms. Jenerette testified that the third black male was standing behind the red car throughout the robbery, but was unsure whether he had "an active role" in the crime. She did not initially see that third male get in the car when it left the apartment complex. However, she saw the red car again after the robbery at a stop light and noticed then that there were three males in it.

Later that night a show-up was conducted of two individuals. Ms. Jenerette was able to identify the man in the white shirt, but was unable to identify the other male - indicating that "it looked like him" but that she could not be sure. She did identify the red car. She identified her food stamp card, which officers recovered. The officer also returned her car key.

Ms. Jenerette admitted she withheld information from police and in a prior deposition as she never told anyone she went to the apartment complex to purchase marijuana. She testified she was unsure whether the male at Wal-Mart was the same man from the robbery.

On cross-examination, Ms. Jenerette confirmed that at the show-up on the night of the robbery she identified Davis as the male she met at the apartment complex. She further confirmed she was unable to identify the other male who was in the show-up.

T.G., a named victim of Davis' armed robbery charge, who was nine years old at the time of the offense also testified. Though he could not remember the date, he did remember that he and Ms. Jenerette went to Wal-Mart shortly after moving to Jacksonville. They left Wal-Mart when it was dark and went to some apartments across the street. Ms. Jenerette drove to the side of the apartments and parked the car. Both T.G. and Ms. Jenerette exited the car. Two black guys

were standing by a burgundy car, one came up and hit Ms. Jenerette behind the head. T.G. ran back into the passenger seat of his car.

T.G. testified that one of the males wore a white shirt, sweat pants, and some "slide-on shoes"; that particular individual was short and skinny. The other male wore a black jacket, black pants, white shoes, and a black hat. There were three males present; the third male stood by a door. The man with the black clothes was the one standing by the door[,] and the one who hit Ms. Jenerette and held her at gunpoint was wearing blue clothing.

The man in the white shirt got into the car, demanded money using bad language, and took the money T.G. threw at him. The man in the white shirt also took phones and paperwork from the car. He was holding a silver gun. The man in the white shirt and two other males then left in the red car. T.G. identified the red car in a photo.

At the show-up, T.G. identified the man with the white shirt as the person who took his money in the car and had a gun. He also i[]dentified the other male as the man in the black hat and jacket as the person standing by the door. He did not see the man who held Ms. Jenerette at gunpoint. He testified that the men told Ms. Jenerette "[h]old your head down or I'll shoot you -– I'm going to shoot you in front of your son."

On cross-examination, Mr. Dixon's attorney asked T.G. if it was true that on the date of the show-up "you told police that you could not identify the second person?" T.G. testified that he could not remember.

The State next called Roosevelt Knight. He testified that as he was leaving Wal-Mart that evening he stopped his car because he saw two panicked people walking towards him. He could tell they were in

distress and very distraught about a situation. He explained T.G. was crying and appeared very scared. He used his phone to call 9-1-1.

Officer J.T. Crotty of the Jacksonville Sheriff's Office also testified. He was working the night of April 22, 2013, and was dispatched to the scene of the 9-1-1 call. He met with Ms. Jenerette and T.G. In doing so, he obtained information about the red car and sent a BOLO over the radio. He then received information that the suspects were apprehended. He transported T.G. to the show-up; T.G. was very upset and scared.

Referring to his written report, Officer Crotty testified that T.G. was able to identify one of the suspects at the show-up. That suspect was William Davis. After reviewing his report once more, Officer Crotty testified that as to the second suspect, T.G. "could not positively identify him."

Again referring to his report Officer Crotty testified that Ms. Jenerette positively identified Davis as the person who robbed her and T.G., but only indicated that the other male "looks like the one who had the gun", but that she could not positively identify him. Officer Crotty retrieved Ms. Jenerette's food stamp card and $156.00 in cash from William Davis.

On cross-examination, Officer Crotty confirmed that Mr. Dixon was the second suspect whom T.G. was unable to identify and Ms. Jenerette stated "looked like the one who had the gun."

Officer Kenneth Chastain of the Jacksonville Sheriff's Office testified that he encountered the suspect car after hearing the BOLO on April 22, 2013. He identified Mr. Dixon and Davis as two people that were in the car and identified both men in open court. He first saw the car at a gas station and then began to follow it once the car drove away. He called for back-up.

Ultimately he activated his lights, the red car stopped short of hitting another patrol car, the driver fled and Officer Chastain pursued him. Officer Chastain gave commands to the driver to stop but he did not. Eventually Officer Chastain caught the driver, who turned out to be Davis. Davis possessed money, a key fob, Wal-Mart receipt, and an EBT card; the key fob belonged to the car driven by Ms. Jenerette. Officer Chastain had no contact with Mr. Dixon, but testified he was present that evening.

On cross-examination, Officer Chastain testified he first saw the red car at about 10:30 P.M. Due to pursuing Davis, Officer Chastain did not observe the actions of the other occupants of the red car.

Officer Christopher Winn, with the Jacksonville Sheriff's Office, testified to hearing Officer Chastain's call for back-up. Once the vehicle stopped he saw the driver and the passenger exit the vehicle and flee through the complex. The third male was in the backseat. He was holding his hands up. According to Officer Winn, that person had to be let out of the back seat due to a possible door malfunction. He identified the suspect that remained inside the car as Mr. Dixon.

Officer Jose Ruiz testified he also saw two individuals flee from the red car; he pursued the passenger. However, he was unable to detain the passenger. He had no contact with Mr. Dixon.

Kendra Dixon, Mr. Dixon's mother, testified. She identified her son in open court. In 2013 she owned two cars, one a burgundy 1999 Toyota Corolla. She allowed Mr. Dixon to borrow the Corolla [on] April 22, 2013. He left with the car between 7:00 and 8:00 P.M. alone. Ms. Dixon provided law enforcement permission to search her car. Ms. Dixon knew Davis as an acquaintance of her son's; she identified him in open court.

The State then rested its case. The defense moved for a judgment of acquittal as to the charge of Accessory after the Fact. Defense counsel argued that the State failed to prove Mr. Dixon maintained, assisted, aided or attempted to aid Davis, that Mr. Dixon had knowledge Davis committed a felony, or that Mr. Dixon aided Davis in an attempt to assist him to avoid detection. The State replied it would rely on the evidence adduced in its case-in-chief. The trial court, without comment, denied Mr. Dixon's motion.

The defense then called Ms. Karavay Cannon. She met Mr. Dixon in March of 2013. She testified the two spoke on the phone several times a day, several times a week. Looking at phone records, Ms. Cannon testified that she spoke with Mr. Dixon on April 22, 2013, from 10:15 P.M. until 10:41 P.M.

On cross-examination she explained that she could not state the exact date she spoke with Mr. Dixon. On re-direct, Ms. Cannon stated she could only remember the prefix of her number as 672, but did not know her previous phone number. She explained that she called Mr. Dixon after the date the defense attorney "listed", but he never picked up. That last time they spoke, she did not hear any commotion in the background; Mr. Dixon did not appear upset, out of sort, or nervous.

The defense then called Kendra Dixon. She paid for the phone Mr. Dixon used and testified that his phone number was 885-1577. When she called that number Mr. Dixon answered; to her knowledge, no one else used his phone. She identified phone records for Mr. Dixon's phone and testified the date of the phone calls within the records were all from April 22, 2013. She identified two phone calls Mr. Dixon made to her on that date, which were made at 10:05 P.M. and 10:46 P.M. The defense entered the records into evidence without State objection.

16

Both defendants rested their cases and each exercised his right to remain silent. During closing argument the State argued: "[t]hen after the robbery was completed we didn't hear any testimony about how defendant Davis had grabbed defendant Dixon by the arm to get him to the car. He volunteered. He got right in that car with him as soon as the robbery concluded." Mr. Dixon's counsel objected arguing "going towards the defendant's right to remain silent." The trial court overruled the objection and asked the State to be cautious. When defense counsel asked to approach, the trial court stated "I have already ruled. You can put it on the record later." The State proceeded:

> As soon as the robbery concluded defendant Dixon, he got in the backseat of that car, the car that belonged to his mother. He got in the backseat and he stood idally [sic] and did nothing as a nine-year old was robbed and a woman was held at gunpoint.

The State further argued that Mr. Dixon maintained, assisted, aided or attempted to aid Davis because "it was his vehicle. He was standing there. He knew it was going on." "He aided when they fled off in that vehicle after the robbery was committed." The State argued Mr. Dixon "assisted by providing the get away vehicle" and getting in the car with Davis.

Before his closing argument, Mr. Dixon's counsel asked to take a break, the jurors were excused, and counsel addressed the trial court's ruling on his objection regarding Mr. Dixon's right to remain silent. He acknowledged that the trial court overruled the objection, moved for a mistrial, and explained that the comment led the jury to believe they did not hear Mr. Dixon's account of the incident. The trial court again denied the objection and counsel's motion for mistrial.

Resp. Ex. 12 at 2-14 (record citations omitted).

In its amended answer brief, the state accepted Petitioner's statement of

the case and facts, subject to the following additions:

> [T.G.] testified that when they arrived at the
> apartment complex, Samantha Jenerette drove her car
> "to the side" of the apartment complex and parked her
> car next to a burgundy car. They got out of Jenerette's
> car and walked [] within a foot, "like close by", from the
> burgundy car. [T.G.] saw two guys standing next to the
> burgundy car, and a third man standing by a door.
> [T.G.] testified that [at the show up and at his
> deposition,] he identified the third man, who was by the
> door, as the man wearing black[.]
>
> When Samantha Jenerette was asked if she
> actually saw them get into the car and leave, she
> replied "Yes, ma'am. The car sped off" and that she saw
> "Two or three, maybe. I'm not really sure[.]" When
> Appellant and his fellow robbers left the area,
> Jenerette fled the scene.
>
> Jenerette then flagged down Roosevelt Knight,
> who loaned her his cellular telephone and had the two
> victims sit in his car while parked near the crime scene.
> 9-1-1 is called and, while speaking, Jenerette sees
> Davis driving the red vehicle with 2 other black males
> in [the] car. They were at the red light right in front of
> Jenerette as they "circled back" in the red/burgundy
> car. Jenerette believed they were coming back to see if
> she was still at her car, the scene of their crime.
>
> When the red/burgundy car was stopped, officers
> chased two that fled and Officer Winn went to [the]
> vehicle and saw [Dixon] in [the] backseat, holding his
> hands up. Winn described something wrong with the
> car door, that [Dixon] could not get out of the car, that
> it was either locked or damaged.

Resp. Ex. 13 (record citations omitted).

The jury found Petitioner guilty of accessory after the fact and Davis guilty of two counts of robbery. Resp. Ex. 8 at 825. Petitioner, with help from appellate counsel, sought a direct appeal, and the First District Court of Appeal per curiam affirmed Petitioner's judgment and conviction without a written opinion. Resp. Ex. 15.

## IV.    **The Amended Petition**

### A. Ground One

Petitioner argues that the trial court erred in denying Petitioner's motion for judgment of acquittal, violating his rights under the Fourteenth Amendment. Doc. 5 at 13-18. According to Petitioner, the state presented no evidence that Petitioner committed an overt act of intent to aid Davis in avoiding detection, arrest, trial, or punishment. Id. at 15.

Petitioner, through appellate counsel, raised this issue on direct appeal. Resp. Ex. 12 at 16. He argued as follows:

> In the instant case, the State charged Mr. Dixon with accessory after the fact for "providing the vehicle used during the commission of the crime, knowing that William Davis had committed . . . Armed Robbery, with the intent that William Davis shall avoid or escape detection, arrest, trial or punishment." However, the evidence adduced at trial established that Davis, wearing a white t-shi[r]t, was in the driver's seat of the vehicle in question when the victims arrived at the scene of the armed robbery.
>
> Mr. Dixon, the third black male, was somewhere behind the vehicle and did not participate in the armed

19

robbery. In fact, Ms. Jenerette did not observe Mr. Dixon get in the vehicle with Davis after the armed robbery. When officers stopped the vehicle in question after the armed robbery, Davis and another fled, but Mr. Dixon remained in the backseat of the vehicle holding his hands up.

Here, the defense moved for a judgment of acquittal arguing that the State failed to prove Mr. Dixon maintained, assisted, aided or attempted to aid Davis, that Mr. Dixon had knowledge Davis committed a felony, or that Mr. Dixon aided Davis in an attempt to assist him to avoid detection. The State replied it would rely on the evidence adduced in its case-in-chief. The trial court denied Mr. Dixon's motion. This was error as the State failed to prove that Mr. Dixon took some overt action to assist Davis after the armed robbery occurred with the intent to aid him in avoiding or escaping prosecution.

In closing argument, the State argued that it proved its case against Mr. Dixon as "he aided when they fled off in that vehicle after the robbery was committed." It further argued that Mr. Dixon assisted Davis by providing the getaway vehicle and getting in the car with Davis after the armed robbery. However, the fact that Mr. Dixon got in the **back seat** of the vehicle **after the crime occurred** does not establish an overt act on his part or an intent to assist Davis in avoiding or escaping arrest or prosecution.

No evidence was presented that Mr. Dixon provided Davis with the keys to the vehicle either before or after the armed robbery so that Davis could drive off after committing the crime. Likewise, there was no evidence to rebut the reasonable hypothesis that if Mr. Dixon provided aid it was to protect his personal safety or for other personal reasons, but was not provided with the intent to assist Davis from avoiding or escaping arrest or prosecution.

> The law does not hold Mr. Dixon criminally responsible for failing to prevent Davis from committing a crime, or for failing to report it. <u>Bowen</u>, 791 So. 2d at 50. The burden lies with the State to prove Mr. Dixon intended to assist Davis in avoiding or escaping arrest or prosecution. This the State failed to do. As such, this Court should vacate Mr. Dixon's conviction and sentence finding that the trial court erred in denying hi[s] motion for judgment of acquittal.

Resp. Ex. 12 at 17-21 (record citations omitted).

In its answer brief, the state argued:

> Contrary to argument by Appellant, this is not a purely circumstantial evidence case. The State presented <u>direct</u> evidence of Appellant's guilt – he provided his mother's vehicle for co-defendant's use and accompanied co-defendant to [the] scene, stood by while co-defendant robbed a child and a woman and then got into the vehicle and fled the scene to avoid arrest together with Davis, the codefendant.
>
> . . . .
>
> In this case, Appellant's mother testified that Appellant had the use of her vehicle, that it was in Appellant's possession the night of the robbery, that he left his mother's residence in the get-away vehicle and that he was driving alone. Appellant was apprehended in the backseat of his mother's vehicle, the vehicle that met up with Samantha Jenerette and T.G., the vehicle that Appellant stood by while a gun was placed to the head of Jenerette while she and T.G. were robbed, the same vehicle that Appellant and codefendant drove to the Forest Apartments where the armed robbery occurred, the same vehicle that fled the scene, and was later apprehended, the vehicle he and his co-defendant were riding in, the vehicle that he was extracted from by law enforcement officers.

. . . .

Appellant's claim that he committed no "overt action['] assisting co-defendant is incorrect, as Kendra Dixon, Appellant's mother testified that she allowed Appellant to use her car and that he left with the car, driving alone. Appellant argues that "no evidence was presented that Mr. Dixon provided Davis with keys to the vehicle, either before or after the armed robbery." This argument fails to address that Appellant drove alone in the car that Davis was seen sitting in the driver's seat, before[,] during[,] and after the armed robbery.

Further, testimony of victims put Appellant at the scene of the robbery, within steps of where Jenerette was knocked to the ground and held there with a gun to her head. [T.G.]'s description of Appellant standing "close by", and that they walked within a foot of the burgundy car illustrates Appellant[']s knowledge of the crime. State's Exhibit 1-B, a photograph of Jenerette's car parked at the crime scene illuminates the close environment in which the robbery took place. Also, [T.G.]'s testimony that Appellant, the third man at the scene of the robbery, was standing by the back of the vehicle, "by a door" is supported by State's Exhibit 1-B.

The trial court correctly denied Appellant's motion for judg[]ment of acquittal as the evidence was sufficient. As noted above, "Once the State introduces such evidence, it is the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt." [ ] The legal test for determining whether a Judgment of Acquittal should be granted is "whether after all conflicts in the evidence and all reasonable inferences there-from have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and the

> judgment." <u>Tibbs v. State</u>, 397 So. 2d 1120, 1123 (Fla.
> 1981).
>
> The evidence present in this case was clearly
> sufficient for a jury to find that Appellant committed
> the charged crime. Therefore, his Judg[]ment and
> Sentence should be affirmed.

Resp. Ex. 13 at 8-10 (record citations omitted). The First DCA found Petitioner's

claim to be without merit and affirmed his judgment and conviction without a

written opinion. Resp. Ex. 15.

Here, Respondents contend that when raising this issue on direct appeal,

Petitioner failed to fairly present the federal nature of this claim to the state

court, and thus his current federal due process claim is unexhausted and

procedurally defaulted. Doc. 9 at 42-48. They also assert the claim is otherwise

without merit. <u>See</u> <u>id.</u> at 48-52.

The Court agrees that Petitioner did not present the federal nature of this

claim to the state appellate court. In his initial brief filed on direct appeal,

Petitioner did not state or suggest that he was raising a federal due process

claim, nor did he rely on any other federal constitutional guarantee. Resp. Ex.

T. Instead, he argued, in terms of state law only, that the circumstantial

evidence for which the state relied in opposing Petitioner's motion for judgment

of acquittal was insufficient under Florida law. Resp. Ex. 12 (citing <u>Bowen v.</u>

<u>State</u>, 791 So. 2d 44, 47 (Fla. 2d 2001)); <u>see also</u> Resp. Ex. 14 (Petitioner's reply

brief citing <u>Knight v. State</u>, 186 So. 3d 1005, 1010 (Fla. 2016); <u>Staten v. State</u>,

519 So. 2d 622, 625 (Fla. 1988)). Thus, the federal nature of this claim is unexhausted and procedurally defaulted, and Petitioner has failed to show cause for or prejudice from this procedural bar. Likewise, Petitioner has not shown that failure to consider this claim on the merits will result in a fundamental miscarriage of justice.

Petitioner argues, however, that this claim is exhausted because when addressing this issue on appeal, the state court applied a legal standard identical to the one used in federal courts. See Doc. 10 at 2. In any event, assuming Petitioner is correct, and this claim is properly exhausted, he is still not entitled to the relief he seeks because the First DCA's adjudication is entitled to deference. When reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court must assume that the jury resolved any evidentiary conflicts in favor of the prosecution, and the court must defer to that resolution. Id.

Here, the evidence presented at trial supported the trial court's denial of Petitioner's motion for judgment of acquittal. Four elements applied to Petitioner's accessory after the fact charge:

24

1. Armed Robbery was committed by WILLIAM HENRY DAVIS, III.

2. After the Armed Robbery was committed, TERRY LEQUAN DIXON maintained, assisted, aided or attempted to aid, WILLIAM HENRY DAVIS, III.

3. At that time, TERRY LEQUAN DIXON knew that WILLIAM HENRY DAVIS, III had committed the Armed Robbery.

4. TERRY LEQUAN DIXON did so with the intent that WILLIAM HENRY DAVIS, III avoid or escape detection, arrest, trial, or punishment.

Resp. Ex. 9 at 6. At trial, T.G. testified that three men participated in the armed robbery – one wearing a white shirt, one wearing a black jacket and black pants with white shoes, and one wearing blue clothing. Resp. Ex. 6 at 23-28. He stated that while the man in blue held Jenerette at gunpoint, the man wearing the white shirt got into T.G.'s car and demanded money and took phones and other items from the center console. Id. at 26-27. T.G. explained the man in the black shirt stood by their burgundy/red car and watched as the robbery occurred. Id. at 25. He stated that following the robbery, he saw the three men get into the burgundy/red car and drive away. Id. at 32. Police then arrived and drove T.G. to another location where T.G. advised officers he recognized the two males in custody as two of the individuals who were at the scene – the one wearing a white shirt who took items from T.G.'s car (Davis) and the other who was wearing the black jacket and pants standing by the burgundy/red car as the

robbery occurred (Petitioner). Id. at 34. When shown a picture of the vehicle the two men were apprehended from, T.G. positively identified it as the burgundy/red car the three men used to drive away from the scene. Id. at 32; Resp. Ex. 7 at 30-34.

Petitioner's mother also identified the car used during the getaway as her vehicle and explained she allowed Petitioner to borrow it the night of the robbery. Resp. Ex. 7 at 114-15. And Officer Winn testified he apprehended Petitioner from the backseat of the same vehicle before escorting him to the show-up, and he then identified Petitioner in court. Id. at 33. As to intent, a review of the evidence (Petitioner watching the armed robbery and then allowing Davis to drive his mother's vehicle away from scene while voluntarily riding as a passenger in the same vehicle) supports an inference that Petitioner's underlying goal was to help hinder Davis's apprehension. See, e.g., United States v. Salamanca, 990 F.2d 629, 637-40 (D.C. Cir. 1993) (holding that flight from the scene of an assault along with the principal may be "strong evidence" of being an accessory after the fact); 18 U.S.C. § 3 (defining the crime of being an accessory after the fact to include assisting an offender, "knowing that an offense . . . has been committed"). Taken in the light most favorable to the state, the Court finds there was sufficient evidence to permit a rational trier of fact to find Petitioner guilty of this offense. As such, upon review of the record, this Court concludes that the state court's adjudication of this claim was not

contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground One is denied.

### B. Ground Two

Petitioner asserts the trial court erred in overruling trial counsel's objection to the state's improper statements made during closing arguments, which amounted to improper burden shifting and violated Petitioner's right to remain silent under the Fifth Amendment. Doc. 5 at 18. He also contends the trial court erred in denying his later motion for a mistrial based on this improper comment. Id. at 19.

Petitioner, with help from appellate counsel, raised this claim on direct appeal. Resp. Ex. 12 at 22. Petitioner asserted, in pertinent part, as follows:

> In the instant case, the State argued: "[t]hen after the robbery was completed **we didn't hear any testimony about how defendant Davis had grabbed defendant Dixon by the arm to get him to the car.** He volunteered. He got right in that car with him as soon as the robbery concluded." As defense counsel explained, this comment amplified to the jurors that they did not hear Mr. Dixon's account of the incident. The State's comment, "at least indirectly, . . . highlighted for the jury the fact that [he] was not testifying at trial and still had offered no plausible explanation." See DiGuilio, 491 So. 2d at 1138.

> Thus, this Court should find that the State's comment was fairly susceptible of being interpreted as

27

a comment on Mr. Dixon's right to remain silent, and that this comment was not harmless in light of the bleak, circumstantial evidence presented to convict him of accessory after the fact.

Resp. Ex. 12 at 22-25 (record citations omitted).

In its answer brief, the state responded as follows:

Defendant Dixon's argument on appeal hinges on a single statement made during the State's closing argument: "(t)hen after the robbery was completed we didn't hear any testimony about how defendant Davis had grabbed defendant Dixon by the arm to get him to the car. He volunteered. He got right in that car with him as soon as the robbery concluded." While Appellant's Initial Brief presents only one issue for review, it argues that the trial court erred in two ways: by not sustaining Defendant's objection to the prosecutor's closing, and by not granting Defendant's subsequent motion for mistrial.

First, the prosecutor's remark regarding uncontroverted evidence was not improper. Florida courts have recognized two distinct categories of "uncontroverted evidence" arguments: permissible arguments that comment on the uncontroverted nature of the evidence, and impermissible remarks that are fairly susceptible to interpretation as comments on a defendant's exercise of his right to remain silent. Rich v. State, 756 So. 2d 1095, 1096 (Fla. 4th DCA 2000), citing Rodriguez v. State, 753 So. 2d 29, 38 (Fla. 2000). A prosecutor's comment that evidence is uncontroverted is improper if the defendant is the only person who can refute that evidence, especially if only one state witness testifies against the defendant; such comments may lead the jury to believe that a defendant has to present a case. Hill v. State, 980 So. 2d 1195, 1199 (Fla. 3d DCA 2008).

However, comments emphasizing the uncontroverted nature of the State's evidence are permissible and typical arguments in cases where a defendant does not testify. Smith v. State, 378 So. 2d 313, 314 (Fla. 5th DCA 1980), opinion approved of 394 So.2d 407 (Fla.1980.)

In Smith, the defendant was placed at the scene of a burglary by fingerprint evidence and his possession of a pocket knife stolen from the victim. Smith did not testify, but did have an alibi witness say that he was elsewhere when the crime occurred. Id. at 313-14. During closing arguments, the prosecutor stated that "there was no explanation" for Smith's fingerprints at the crime scene. Id. at 314. The Fifth District Court of Appeals held that the prosecutor's argument was a proper comment on the lack of any evidence on a particular issue. Id.

A prosecutor's comments in closing must be taken in context, and a prosecutor may state that evidence of an essential element of an offense is uncontroverted if witnesses other than the defendant could have testified to rebut that evidence. Bell v. State, 33 So. 3d 724, 726-27 (Fla. 1st DCA 2010) approved, 108 So. 3d 639 (Fla. 2013). In this case, we have multiple witnesses who testified, but neither one gave any testimony indicating that Appellant was forced into the vehicle. Victim/witness, Jenerette, testified at least three times that "there was a partner standing behind the car . . . a person like behind the car" and that he was there the entire time the robbery occurred. Further, she testified that she saw them get into the car and leave. The State's second witness, T.G., testified similarly when he stated three times on direct examination that Dixon "was standing like by a door" and "the one with the black clothes was standing by a door" and once on cross-examination, answering "Yes" to defense attorney's question regarding "the man wearing the black hat and jacket as the gentleman who was standing by the – by the door or by the porch." T.G.

further testified that "they went in their car[,]" testifying that all three men got into their vehicle and left the scene.

Each witness's testimony supported the prosecutor's statement "He stood there and he did nothing." Neither witness testified . . . that Appellant was forced into the vehicle. Prosecutor's statement on closing was a logical argument based on the facts of the case.

To be fundamental error, "the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Brown v. State, 124 So. 2d 481, 484 (Fla. 1960). A prosecutor's improper remarks do not constitute fundamental error unless they jeopardize the validity of the trial or verdict. Rimmer v. State, 825 So. 2d 304, 324 (Fla. 2002).

The State presented ample evidence that Defendant was present, and in fact, stood behind his vehicle, watching while Jenerette and T.G. were robbed at gunpoint. Evidence clearly demonstrates that he stood behind the car while one co-defendant was holding a gun to the head of a prone Jenerette, while co-defendant Davis went through Jenerette's pockets and removed papers and three cellphones from the vehicle's console. And when the robbery was concluded, the testimony shows that Appellant and his co-defendants fled together in Dixon's vehicle, the car he borrowed from his mother.

If the prosecutor's statement had been fairly susceptible to interpretation as a comment on Defendant's right to remain silent, then the remark would be reviewed for harmless error and the State would bear the burden of proving that there is no reasonable possibility the error contributed to the conviction. State v. DiGuilio, 491 So. 2d 1129, 1138

(Fla. 1986); <u>State v. Marshall</u>, 476 So. 2d 150, 153 (Fla. 1985) (State has burden of showing error is harmless beyond a reasonable doubt). However, a single improper comment is harmless beyond a reasonable doubt when there is no reasonable possibility the verdict would have been different if the error had not occurred. <u>Richardson v. State</u>, 604 So. 2d 1107, 1109 (Fla. 1992), opinion corrected on denial of reconsideration (Oct. 8, 1992).

In light of the evidence cited above, there is no reasonable possibility that the prosecutor's single comment in closing argument contributed to Mr. Dixon's conviction. The evidence of Jenerette and Garrett, the two witnesses who testified before the jury clearly supports the jury's verdict.

Last, the trial court did not abuse its discretion in denying Appellant's motion for mistrial. Granting a motion for mistrial is only proper if the prosecutor's comments are so prejudicial that no reasonable person would allow the trial to continue. <u>Ford v. State</u>, 802 So. 2d 1121, 1129 (Fla. 2001). In order to grant a mistrial for improper closing argument, the objectionable comments must be so pervasive, inflammatory, and prejudicial so as to preclude the jury's rational thinking of the case. <u>Knoizen v. Bruegger</u>, 713 So. 2d 1071, 1072 (Fla. 5th DCA 1998) (citations omitted).

A motion for mistrial based on a prosecutor's remarks should be denied unless "the error committed was so prejudicial as to vitiate the entire trial." <u>Cobb v. State</u>, 376 So. 2d 230, 232 (Fla. 1979). In <u>Poole v. State</u>, 997 So. 2d 382 (Fla. 2008), even though a prosecutor made a blatant and direct reference to a defendant's choice not to testify (commenting on the fact that Poole himself did not testify to rebut the testimony of two detectives), the Court held that in light of the evidence against Poole, the trial court did not abuse its discretion by denying Poole's motion for mistrial. <u>Poole</u>, 997 So. 2d at 390-91.

> The prosecutor in Appellant's case made an isolated remark that did not comment directly on the fact Appellant did not testify, and it was far less harmful than the closing argument made in Poole. As a result, in Appellant's case, the trial court did not abuse its discretion in finding that the prosecutor's comment did not vitiate the entire trial or preclude the jury's rational consideration of the case. Therefore, his Judg[]ment and Sentence should be affirmed.

Resp. Ex. 13 at 12-17 (record citations omitted). The First DCA found Petitioner's claim to be without merit and affirmed his judgment and conviction without a written opinion. Resp. Ex. 15.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, as the reviewing Court, it must evaluate an allegedly improper comment in the context of both the prosecutor's entire closing argument and the trial as a whole, because "[c]laims of prosecutorial misconduct are fact-specific inquiries which must be conducted against the backdrop of the entire record." United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995); accord United States v. Young, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial."). An improper prosecutorial remark compels habeas corpus relief only if the remark is so

egregious that the proceeding is rendered fundamentally unfair. "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181(1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Due process is denied "when there is a reasonable probability," or "a probability sufficient to undermine confidence in the outcome," that, but for the improper remarks, "the outcome of the proceeding would have been different." United States v. Eyster, 948 F.2d 1196, 1206-07 (11th Cir. 1991); see also Tucker v. Kemp, 802 F.2d 1293, 1296 (11th Cir. 1986) ("If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."). The prosecutor's comments must both (1) be improper and (2) "prejudicially affect the substantial rights of the defendant." United States v. Thompson, 422 F.3d 1285, 1297 (11th Cir. 2005). A prosecutor's statement violates a defendant's right to remain silent if it was "manifestly intended to be a comment on the defendant's failure to testify" or was "of such a character that a jury would naturally and necessarily take it to be a comment" on the defendant's failure to testify. United States v. Blankenship, 382 F.3d 1110, 1128 (11th Cir. 2004)

Here, the comment at issue is – "Then after the robbery was completed we didn't hear any testimony about how defendant Davis had grabbed

defendant Dixon by the arm to get him in the car. He volunteered. He got right in that car with him as soon as the robbery concluded." Resp. Ex. 7 at 705. Evaluating that single comment in the context of the trial evidence as a whole, the Court cannot find a denial of due process. Indeed, considering the direct evidence and eyewitness testimony placing Petitioner at the scene, that his own mother's car was used in the robbery, and all the perpetrators got into Petitioner's mother's vehicle to escape the scene, Petitioner cannot show that but for the prosecutor's comment, the outcome of his case would have been different. To that end, Petitioner has failed to show that the prosecutor's improper comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

Upon review of the record and considering the closing arguments and the trial evidence, the Court finds that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground Two is denied.

## C. Ground Three

Petitioner asserts that his trial counsel was ineffective for failing to object or request a clarifying instruction on the principal theory jury instruction where

the jury was never informed that the principal instruction applied only to co-defendant Davis. Doc. 5 at 22.

Petitioner raised this claim in his pro se Florida Rule of Criminal Procedure 3.850 motion. Resp. Ex. 16 at 27. The trial court summarily denied the claim as follows:

> In Ground Five, Defendant alleges counsel was ineffective for failing to object to the principal instruction being read to the jury when Defendant was not charged as a principal. Defendant claims this instruction created confusion among the jurors about whether it should apply to Defendant or his co-defendant. Defendant also argues he was prejudiced by this instruction because he claims it has nearly the same elements as the instruction for Accessory After the Fact, which could have confused the jurors.
>
> Without reaching whether counsel was deficient, there is no prejudice because it was clarified multiple times at trial that the instruction only applied to Co-Defendant. During the State's closing, the principal instruction was explained regarding only the co-defendant. At no time while explaining the elements of the offenses did the State assert the instruction applied to Defendant. During the defense closing, counsel clarified that Defendant was not charged with Robbery or Theft, but Accessory After the Fact. Counsel went on to explicitly clarify: "the principal argument, and you are going to see a sheet on principal theory, and that doesn't apply to Mr. Dixon at all, don't be confused by that." During jury instructions, the Court specified that the Robbery instructions only applied to Co-Defendant and the Accessory After the Fact instructions only applied to Defendant. Thus, it was clear the principal instruction only applied to Co-Defendant. There is nothing to suggest Defendant suffered any prejudice, much less the level to reach his burden of a reasonable

> probability of a different outcome. Therefore, Ground
> Five is without merit and denied.

Resp. Ex. 19 at 10 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. 25.

The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court applies deference to the state court's finding that Petitioner was not prejudiced by an alleged error. Indeed, during closing arguments, the state only explained the principal theory when describing the charges only against Davis. Resp. Ex. 7 at 715-16. Also, during his closing arguments, trial counsel clarified: "The principal argument, and you are going to see a sheet on principal theory, and that doesn't apply to Mr. Dixon at all. Don't be confused by that. It only goes towards Mr. Davis[.]" Resp. Ex. 7 at 763. As such, upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Three is denied.

## D. Ground Four

Petitioner argues that his trial counsel was ineffective for failing to object to the joinder of Petitioner and Davis's cases for trial or for failing to move to sever the cases. Doc. 5 at 30.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. 16 at 16. The trial court summarily denied the claim as follows:

> In Ground Two, Defendant alleges counsel was ineffective for failing to move to sever Defendant's trial from Co-Defendant. Defendant argues severing the trial was necessary because the State would have been prevented from calling some witnesses to testify and Co-Defendant would have testified Defendant was not at the scene of the robbery.

> Whether to sever or join defendants is a decision that should be determined on a case-by-case basis. Bryant v. State, 565 So. 2d 1298, 1302 (Fla. 1990); Dean v. State, 478 So. 2d 38, 43 (Fla. 1985). Some general rules regarding joinder and severance have, however, developed over time. A defendant is not entitled to severance if: (1) the defendant is given a full opportunity to confront and examine witnesses called against him; (2) none of the defendants inculpated each other by confessing as explained in Bruton v. United States, 391 U.S. 123 (1968); and (3) the evidence is not too complex in that it would confuse the jury. McCray v. State, 416 So. 2d 804, 807 (Fla. 1982); see also Gordon v. State, 863 So. 2d 1215, 1223 (Fla. 2003).

> Initially the Court notes, Defendant had a full opportunity to confront the witnesses against him, his co-defendant did not make a Bruton-type confession, and the evidence presented was not so complex that the jury would be confused by it and incapable of applying it to the conduct of each individual defendant. The fact

37

that Defendant may have had a better chance of acquittal if tried separately does not justify severance. McCray, 416 So. 2d at 806. Thus, there was no legal basis for severance and counsel cannot be deemed deficient for failing to make a frivolous argument.[FN3] In an abundance of caution, Defendant's claims of prejudice will also be addressed.

*Exclusion of Some Witnesses*

Defendant claims he was prejudiced by counsel's failure to move to sever the trials because the State would have been prevented from calling some witnesses that were strictly relevant to his co-defendant's case. Defendant does not specify who these witnesses are, but to the extent they were witnesses to the underlying crime they would not have been excluded even if the trials had been severed. Defendant was charged with Accessory After the Fact, which requires the State to prove beyond a reasonable doubt that the co-defendant committed the underlying offense. Bowen v. State, 791 So. 2d 44, 50-5 1 (Fla. 2d 2001). Thus, testimony about the underlying crime of robbery would still have been relevant at a trial only involving Defendant. Accordingly, this claim of prejudice is without merit.

*Co-Defendant Testimony*

Defendant also claims he was prejudiced by counsel's failure to move to sever the trial because joinder of the trials prevented counsel from compelling Co-Defendant to testify. Defendant claims Co-Defendant would have testified that Defendant was picked up after the robbery and had no knowledge of the crime. Defendant does not provide any corroborating evidence to suggest Co-Defendant would have testified in this exculpatory manner or was willing to waive his right to remain silent. Defendant even concedes Co-Defendant would be prejudiced by testifying but argues that had the trials been severed

the prejudice would have gone away. Defendant ignores
the fact that this testimony by Co-Defendant would
essentially amount to a confession and would be usable
against Co-Defendant at his own trial. Thus, whether
severed or not, Co-Defendant faced the same prejudice
in waiving his right to remain silent and testifying in
the manner Defendant claims. Therefore, Defendant's
claim in Ground Two is without merit and is denied.

[FN3: As Defendant points out in his motion there was a
hearing on the State's Motion for Joinder where both
counsel for Defendant and his co-defendant objected to
the joinder, but ultimately conceded there was no legal
basis to not join the trials.]

Resp. Ex. 19 at 5-7 (record citations omitted). Petitioner appealed, and the First

DCA per curiam affirmed the trial court's denial without a written opinion.

Resp. Ex. 25.

The Court addresses this claim in accordance with the deferential

standard for federal court review of state court adjudications. First, Petitioner

cannot show deficient performance, because the severance likely would not have

been granted. Here, during the trial court's hearing on the state's motion for

joinder, trial counsel verbally objected to the request, conceding there was no

legal reason for the objection but instead merely argued about the difference in

evidence the state would need to present for each defendant. Resp. Ex. 3 at 11.

The trial court granted the state's request. Id. at 12. Indeed, the state may try

codefendants together "if they are alleged to have participated in the same act

or transaction, or in the same series of acts or transactions, constituting an

offense or offenses." Fed. R. Crim. P. 8(a). Defendants can move for severance, but a court will grant such a motion only when joinder will result in prejudice. Fed. R. Crim. P. 14(a). And usually "people who are charged together are tried together." United States v. Novaton, 271 F.3d 968, 989 (11th Cir. 2001) (citation omitted). Second, Petitioner cannot establish that had the severance been granted, the result of the trial would have been different. Thus, he cannot meet Strickland's prejudice prong. 466 U.S. at 687.

Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claims was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Four is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.    The Amended Petition (Doc. 5) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.    The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.    If Petitioner appeals this denial, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[6]

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of March, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

Jax-7

C:    Terry Lequan Dixon, #J40148
      Counsel of record

---

[6] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.